UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

**FOR PUBLICATION**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | No. 08-01789 (CGM)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff,<br><br>Plaintiff,<br><br>v.<br><br>UBS EUROPE SE, formerly known as UBS Deutschland AG, as successor-in-interest to Dresdner Bank Lateinamerika AG, and LGT BANK (SWITZERLAND) LTD. as successor-in-interest to Dresdner Bank (Schweiz) AG,<br><br>Defendants. | Adv. Pro. No. 12-01577 (CGM) |

**MEMORANDUM DECISION DENYING DEFENDANT'S MOTION TO DISMISS**

**A P P E A R A N C E S :**

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff*
Baker & Hostetler LLP
45 Rockefeller Plaza

New York, NY 10111
By:    David Sheehan
         Torello Calvani
         Dean D. Hunt
         Farrell Hochmuth
         Marie Carlisle


*Attorneys for Defendant UBS Europe SE*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
By:    Marshall R. King
         Keith R. Martorana


**CECELIA G. MORRIS**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is Defendant's, UBS Europe SE ("UBS Europe" or "Defendant"), motion to dismiss the complaint of Irving Picard, the trustee ("Trustee") for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") seeking to recover subsequent transfers allegedly consisting of BLMIS customer property. Defendant seeks dismissal for lack of personal jurisdiction.  Defendant raises the "safe harbor," "good faith," and "mere conduit," defenses.  For the reasons set forth herein, the motion to dismiss is denied in its entirety.

## Jurisdiction

This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08-CV-10791, and has been referred to this Court.

This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O).  This Court has subject matter jurisdiction over these adversary proceedings pursuant to 28 U.S.C. §§ 1334(b) and 157(a), the District Court's Standing Order of Reference, dated July 10, 1984, and the Amended Standing Order of Reference, dated January 31, 2012.  In addition, the District Court removed the SIPA liquidation to this Court pursuant to SIPA § 78eee(b)(4), (*see* Order, Civ. 08– 01789 (Bankr. S.D.N.Y. Dec. 15, 2008) ("Main Case"), at ¶ IX (ECF No. 1)), and this Court has jurisdiction under the latter provision.  Personal jurisdiction has been contested by this Defendant and will be discussed *infra*.

## Background

The Court assumes familiarity with the background of the BLMIS Ponzi scheme and its SIPA proceeding.  *See Picard v. Citibank, N.A.* (*In re BLMIS*), 12 F.4th 171, 178–83 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard*, 142 S. Ct. 1209, 212 L. Ed. 2d 217 (2022).

This adversary proceeding was filed on December 15, 2011.  (Compl., ECF[1] No. 1).  The Trustee filed an amended complaint on July 14, 2022.  (Am. Compl., ECF No. 105).  Via the amended complaint ("Complaint"), the Trustee seeks to recover $9,296,416 in subsequent transfers made to Dresdner Bank Lateinamerika AG ("DBLA") through their successor-in-interest, UBS Europe SE ("UBS Europe"), and for transfers made directly to UBS Europe.  (*Id.* ¶ 3).  At the time of the transfers, DBLA was a German bank with offices around the world,

---

[1] Unless otherwise indicated, all references to "ECF" are references to this Court's electronic docket in adversary proceeding 12-01577-cgm.

including the United States. (*Id.* ¶ 7). Defendant is successor-in-interest to DBLA, is a wholly owned subsidiary of UBS Europe, and maintains its headquarters in Germany. (*Id.* ¶ 54).

The subsequent transfers were derived from investments with BLMIS made by Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Fairfield Sigma"). (*Id.* ¶¶ 99, 104). Fairfield Sentry and Fairfield Sigma are considered "feeder funds" of BLMIS because the intention of the funds was to invest in BLMIS. (*Id.* ¶¶ 2, 8).

Following BLMIS's collapse, the Trustee filed an adversary proceeding against Fairfield Sentry and related defendants to avoid and recover fraudulent transfers of customer property in the amount of approximately $3 billion. (*Id.* ¶ 92). In 2011, the Trustee settled with Fairfield Sentry. (*Id.* ¶ 93). As part of their settlement, Fairfield Sentry and Fairfield Sigma consented to judgments in the amounts of $3.054 billion and $752.3 million, respectively. (Consent Js., 09-01239-cgm, ECF Nos. 109–10). Only $70 million has been paid to the BLMIS customer property estate. (Settlement Agreement, 09-01239-cgm, ECF No. 169). The Trustee then commenced a number of adversary proceedings against subsequent transferees, like Defendant, to recover the approximately $3 billion in missing customer property.

In its motion to dismiss, Defendant argues that the Trustee has failed to plead personal jurisdiction and that Defendant received BLMIS customer property. The Defendant raises the following affirmative defenses: "safe harbor" defense; the "mere conduit" defense; and the "good faith, for value" defense. The Trustee opposes the motion to dismiss. The Court held a hearing on this motion on January 18, 2023. (H'rg Tr. Jan. 18, 2023, ECF No. 136). For the reasons set forth herein, the motion to dismiss is denied in its entirety.

<u>**Discussion**</u>

**Personal Jurisdiction**

Defendant objects to the Trustee's assertion of personal jurisdiction. (Mem. L. ¶ 8–16, ECF No. 100). In the Complaint, the Trustee argues that Defendant purposefully availed itself to the laws of the United States and New York. (Am. Compl. ¶¶ 6–8).

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, the Trustee "must make a prima facie showing that jurisdiction exists." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)). A trial court has considerable procedural leeway when addressing a pretrial dismissal motion under Rule 12(b)(2). *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013). "'It may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion.'" *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)); *see also Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 187 (Bankr. S.D.N.Y. 2018) (same).

"Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction." *Dorchester Fin.*, 722 F.3d at 84–85 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)); *Picard v. Fairfield Greenwich Grp.* (*In re Fairfield Sentry Ltd.*), 627 B.R. 546, 565 (Bankr. S.D.N.Y. 2021) (same). In the absence of discovery, "a plaintiff's prima facie showing of jurisdiction 'may be established solely by allegations.'" *Paroni v. GE UK Holdings Ltd.*, 2021 U.S. Dist. LEXIS 148930 (N.D.N.Y. 2021) (quoting *Ball*, 902 F.2d at 197). Following jurisdictional discovery, the showing must "include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant." *Id.* at 13–14

(citing *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996) (alteration in original) (quoting *Ball*, 902 F.2d at 197).

In order to be subjected to personal jurisdiction in the United States, due process requires that a defendant have sufficient minimum contacts with the forum in which defendant is sued "'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501 (Bankr. S.D.N.Y. 2012), 480 B.R. 501, 516 (Bankr. S.D.N.Y. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The pleadings and affidavits are to be construed "'in the light most favorable to the plaintiffs, resolving all doubts in their favor.'" *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (quoting *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)); *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 187 (Bankr. S.D.N.Y. 2018).

> The Supreme Court has set out three conditions for the exercise of specific jurisdiction over a nonresident defendant. First, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State. Second, the plaintiff's claim must arise out of or relate to the defendant's forum conduct. Finally, the exercise of jurisdiction must be reasonable under the circumstances.

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (cleaned up).

**Purposeful Availment**

"[M]inimum contacts . . . exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018). "Although a defendant's contacts with the forum state may be intertwined with its transactions or interactions with the plaintiff or other parties, a defendant's relationship with a third party, standing alone, is an

insufficient basis for jurisdiction." *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (cleaned up). "It is insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum to establish specific jurisdiction." *Id.*

A party "purposefully avail[s] itself of the benefits and protections of New York laws by knowing, intending and contemplating that the substantial majority of funds invested in Fairfield Sentry would be transferred to BLMIS in New York to be invested in the New York securities market." *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501, 517 (Bankr. S.D.N.Y. 2012).

Successor Jurisdiction

The Trustee has pleaded "UBS Europe is subject to personal jurisdiction in this judicial district as successor-in-interest to DBLA." (Am. Compl. ¶¶ 15, ECF No. 105). In analyzing minimum contacts, "[t]he great weight of persuasive authority permits imputation of a predecessor's actions upon its successor whenever forum law[2] would hold the successor liable

---

[2] Federal Rule of Civil Procedure 44.1, made applicable to adversary proceedings by Federal Rule of Bankruptcy 9017, governs determinations of foreign law in federal court. It states:

> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party of admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.

Fed. R. Civ. P. 441. Courts are permitted to conduct their own independent research to determine foreign law "but [Rule 44.1] imposes no duty upon them to do so." *Baker v. Booz Allen Hamilton, Inc.* 358 F. App'x 476, 481 (4th Cir. 2009).

"The party claiming foreign law applies carries both the burden of raising the issue that foreign law may apply in an action and the burden of proving foreign law to enable the . . . court to apply it in a particular case. *Bigio v. Coca-Cola Co.*, No. 97 Civ. 2858(BSJ), 2010 WL 3377503, at *4 (S.D.N.Y. Aug. 23, 2010) (quoting *Baker*, 358 Fed. Appx. At 481). "Written or oral expert testimony accompanied by extracts from various kinds of foreign legal materials remains the basic mode of proving foreign law." *Id.* Where there is no conflict between a forum's law and foreign law, a court normally applies the law of the forum. *Picard v. Fairfield Greenwich Grp.* (*In re Fairfield Sentry Ltd.*), 627 B.R. 546, 557 (Bankr. S.D.N.Y. 2021). This is true especially where the parties have not demonstrated that the elements of the claim differ under the foreign law. *Mindspirit, LLC v. Evalueserve Ltd.*, 346 F. Supp. 3d 552, 573 n.7 (S.D.N.Y. 2018). An actual conflict arises where the law of each jurisdiction provides different substantive rules, and the differences are relevant and have a significant possible effect on the outcome of the trial, although they need not lead to different outcomes." *Id.* at 559 (quoting *Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 68 (2d Cir. 2017)). Where the party fails to "demonstrate an actual conflict between New

for its predecessor's actions.'" *City of Richmond, Va. v. Madison Mgmt. Grp., Inc.*, 918 F.2d

438, 454 (4th Cir. 1990).  "If a court has personal jurisdiction over the predecessor in interest,

once successor liability is established, personal jurisdiction over the successor in interest

necessarily exists." *Select Creations, Inc., v. Paliafito Am., Inc.*  852 F. Supp. 740, 765 (E.D.

Wis. 1994); *see City of Richmond*, 918 F.2d at 545 (4th Cir. 1990).

In the Second Circuit, a successor is liable as successor in interest if "(1) it expressly or

impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of

seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling

corporation, or (4) the transaction is entered into fraudulently to escape such obligations." *New*

*York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006) (quoting *Schumacher v.*

*Richards Shear Co., Inc.*, 451 N.E.2d 195, 198 (N.Y. 1983).  The Second Circuit has also

adopted of the doctrine of de facto merger for the purpose of "avoid[ing] the patent injustice

which might befall a party simply because a merger has been called something else." *Cargo*

*Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 47 (2d Cir. 2003).

As the rule in this Circuit suggests, successor jurisdiction is typically found when two or

more companies merge.  *Id.*  The Second Circuit explained, albeit in *dicta,* that this is because "a

successor by merger is deemed by operation of law to be both the surviving corporation and the

---

York and another [jurisdiction's] laws, no choice of law analysis need be undertaken." *E. Materials Corp. v.*
*Mitsubishi Plastics Composites Am., Inc.*, 2:17-cv-01034 (ADS)(AYS), 2017 WL 4162309, at *4 (E.D.N.Y. Sept.
19, 2017) (quoting *Park Place Entm't corp. v. Transcontinental Ins. Co.*, 225 F. Supp. 2d 406, 408-09 (S.D.N.Y.
2002)).

Defendant has made no choice of law argument in its papers nor provided the Court with German law
governing corporate mergers. It provided only a single academic article purporting to explain the German
Transformation Act.  Defendant has argued that the classification of the transaction between DBLA and UBS
Europe as a merger under German law would mean this Court could not exercise successor jurisdiction over UBS
Europe.  Defendant has failed to carry its burden to implore the court to consider German law.  Defendant briefed
the Court with New York law on successor jurisdiction.  The Court addresses the issue under New York law. *E.*
*Materials Corp. v. Mitsubishi Plastics Composites Am., Inc.*, 2:17-cv-01034 (ADS)(AYS), 2017 WL 4162309, at
*4 (E.D.N.Y. Sept. 19, 2017).

absorbed corporation." *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 156.  "[E]ach

of the merger partners is deemed to survive in the merged entity, and the surviving entity is

therefore liable for the liabilities of the corporations that joined in the merger." *Id.*  For this

reason, it is typical that a mere acquisition of assets does not trigger successor jurisdiction.

*Bartlett v. Société Générale de Banque Au Liban SAL*, No. 19-CV-00007(CBA), 2020 WL

7089448, at *16 (E.D.N.Y Nov. 25, 2020).

      The Second Circuit has explained that, in contrast to a merger, "the nature of an asset sale

[is] that the seller's ownership interest in the entity is given up in exchange for consideration; the

parties do not become owners together of what formerly belonged to each."  What a mere asset

sale lacks is "continuity of ownership . . . a point that the Second Circuit in *U.S. Bank* repeatedly

referenced in explaining why a successor would incur a predecessor's jurisdictional status

following a merger."  *SUEZ Water N.Y Inc., v. E.I. du Pont de Nemours and Co*., 578 F. Supp.

3d 511, 537 (S.D.N.Y. 2022).

**The Trustee Has Satisfied His Pleading Burden**

      Defendant argues that the Trustee has failed to allege that the transaction between DBLA

and UBS Europe was a merger or its equivalent and this Court cannot assert personal jurisdiction

over UBS Europe.  (Mem. L. 7–8, ECF No. 115).  The Defendant contends that, as successor in

interest to DBLA, UBS Europe inherits the jurisdictional contacts of DBLA only if the

"predecessor and successor remain one in the same after some corporate restructuring event."

(Mem. L. at 7) (citing *SUEZ Water N.Y. Inc. v E.I. du Pont de Nemours & Co*., 578 F. Supp. 3d

511, 536 (S.D.N.Y. 2022)).  According to Defendant, had the Trustee wished to seek successor

jurisdiction, his burden was to "adduce evidence of continuity of ownership" and that the

allegation that "UBS merged DBLA into UBS" is insufficient.  (*Id.* at 7–8 (citing Am. Compl. ¶ 54, ECF No. 105)).

The Trustee has pleaded "UBS Europe is subject to personal jurisdiction in this judicial district as successor-in-interest to DBLA."  (Am. Compl. ¶ 15).  The Trustee has alleged:

> In 2005, DBLA sold its banking and wealth management operations to a subsidiary of UBS AG ("UBS"), and UBS merged DBLA into UBS Deutschland. In 2016, UBS Deutschland AG adopted the legal form of a European stock corporation and changed its name to UBS Europe. Defendant UBS Europe is the successor in interest to DBLA, is a wholly owned subsidiary of UBS, and maintains its headquarters at Bockenheimer Landstrasse 2-4, D-60306 Frankfurt am Main, Germany.

(*Id.* ¶ 54).  The Trustee has also provided an email between a DBLA-soon-to-be-UBS Europe employee explaining to an FGG employee that following the transaction between DBLA and UBS Europe, "everything will remain the same as it currently is . . . the orderrouting [sic] will remain the same as well as all former contacts regarding investment. Even the IT platform . . . will remain the same. . . ."  (King Decl. Ex. 1, ECF No. 116).  This email suggests continuity of ownership is plausible.  The Trustee has plausibly alleged that the transaction between DBLA and UBS Europe was a merger.

**The Defendant's Evidence Does Not Prove a Merger Did Not Occur**

Defendant contends that the evidence the Defendant provides proves that the transaction between UBS Europe and DBLA was not a merger.  (Mem. L. 7, 10–11, ECF No. 115). Defendant argues that the transaction that took place was a "hive-down[3]" which is "is the opposite of a transaction in which predecessor and successor are 'one in the same.'"  (*Id.* at 9). Defendant provides an academic article that describes types of acquisitions under German law

---

[3] "Hive-down" is a term used in some foreign jurisdictions to describe transactions that repackage assets for tax or commercial reasons.

(the "Corporate Transformation Article").  (*Id.*).  Defendant argues that, according to that

article, a "hive-down" is an acquisition of assets and not a merger.  (*Id.* at 10–11).

Defendant has also provided the Court with DBLA's internal document titled "Hive-

Down Plan,"[4] dated April of 2005 (the "Hive-Down Plan").  (King Decl., Ex. 1, ECF No. 116

("Hive-Down Plan")).  The Hive-Down Plan describes the then-contemplated transaction as one

where DBLA was to transfer assets to a newly formed subsidiary and that UBS Europe was to

acquire shares of that subsidiary.  (*Id.*).  Defendant has also provided the Court with an excerpt

of the Corporate Transformation Article distinguishing a hive-down from a merger as it relates to

a German law governing corporate transformation.  (King Decl., Ex. 2).  The Corporate

Transformation Article provides that a merger results in the dissolution of at least one of the

entities involved.  (*Id.* at 5) ("When merging by way of absorption the assets of one legal entity

are transferred to another legal entity, and the entity being acquired is dissolved . . . when

merging by way of a newly formed legal entity, a new legal entity is formed through allotment of

the total assets of two or more legal entities to a separate, newly formed legal entity. As soon as

the assets have been allotted to the new entity, the acquired entities are dissolved").  A merger

occurs when one entity absorbs another or when two entities combine into a separate, newly

formed entity.  *Id.*  In either case, at least one entity dissolves as a result.  (*Id.*).  A hive-down

occurs, according to the article, when assets of legal entity A are transferred to legal entity B, and

the shares of legal entity B are allotted to legal entity A.  (*Id.*) ("A hive-down [] involves part of

the assets, but the shares of the acquiring legal entity are allotted to the legal entity transferring

its assets[.]).  Defendant insists that this evidence affirmatively disproves the Trustee's allegation

that the transaction was a merger.

---

[4] Though the "hive-down" plan provided appears to be an internal document contemplating a transaction between
DBLA and UBS Europe, the Court acknowledges that the King Declaration represents that it was filed by DBLA in
the Commercial Register of Hamburg, Germany.  King Decl. ¶ 2, ECF No. 116.

Defendant's argument that the evidence it has provided proves that a merger did not occur fails for several reasons. Among the most obvious is that the Corporate Transformation Article is not dispositive of the nature of the transaction between DBLA and UBS Europe. As discussed above, courts recognize the various motivations corporations may have to undertake a reorganization. A mere technical classification of a "hive-down" is insufficient to prove: that the transaction was not a merger or its equivalent; that "the purchasing corporation [was not] a mere continuation of the selling corporation;" or that "the transaction [was not] entered into fraudulently to escape such obligations." *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006).

**Whether A Merger Actually Occurred is a Factual Dispute**

By arguing that a merger did not occur, Defendant is attempting to litigate the factual dispute regarding the characterization of the transaction between DBLA and UBS Europe. Absent jurisdictional discovery, a prima facie showing of jurisdiction may be established "solely by allegations." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990). Outside of jurisdictional discovery and an evidentiary hearing on personal jurisdiction, this Court is not permitted to determine whether the Trustee's claims are factually supported. *Vasquez v. Hong Kong and Shanghai Banking Corp. Ltd.*, 477 F. Supp.3d 241, 250 (S.D.N.Y. 2020). Defendant attempts to force the jurisdictional issue through a procedure akin to summary judgment without the Trustee receiving the benefit of jurisdictional discovery. As an outsider to these transactions, the Trustee will need discovery to determine the relationship between DBLA and UBS Europe. Whether this transaction was a merger is a question to which Defendants, and Defendants alone have the requisite information. This Court has not ordered an evidentiary

hearing on the matter so the pleading burden remains the same and the Trustee may establish

personal jurisdiction over Defendant "solely by allegations." *Ball,* 902 F.2d at 197.

Additionally, the Hive-Down Plan, Corporate Transformation Article, and Defendant's

arguments are all contradictory. The description of a hive-down in the article does not resemble

the transaction contemplated in the Hive-Down Plan, nor the description of the transaction in

Defendant's opposition papers. As discussed *supra*, the article describes a hive-down as a

transaction in which assets of legal entity A are transferred to legal entity B, and the shares of

legal entity B are allotted to back legal entity A. (King Decl. Ex. 2) ("A hive-down [] involves

part of the assets, but the shares of the acquiring legal entity are allotted to the legal entity

transferring its assets[.]). Defendant's opposition and the Hive-Down Plan describe a transaction

in which assets of legal entity A are transferred to legal entity B, and the shares of legal entity B

are allotted to legal entity C. (Hive-Down Plan 3; Mem. L. 9, ECF No. 115). In the event the

transaction were a hive-down as described in the Corporate Transformation Article, DBLA

would simply be the holding company of UBS Europe and UBS Europe would be DBLA's

subsidiary. (King Decl. Ex. 2) ("Hive-downs occur, for instance, when an enterprise

incorporates a subsidiary and transfers parts of its assets to that subsidiary"). This kind of

transaction would demonstrate the exact kind of "continuity of ownership" Defendant argues is

not present between DBLA and UBS Europe. (Mem. L. at 10) ("The Trustee has not alleged or

adduced any evidence of 'continuity of ownership—*ie.*, the 'the shareholders of the predecessor

corporation became direct or indirect shareholders of the successor corporation as the result of

the successor's purchase of the predecessor's assets.'" (quoting *Bartlett v. Société Générale de

Banque Au Liban SAL*, No. 19-CV-00007 (CBA)(VMS), 2020 WL 7089448 (E.D.N.Y. Nov. 25,

2020)).

Further, even if the Corporate Transformation article matched the transaction contemplated in the Hive-Down Plan, its evidentiary value is minimal at best. An internal document contemplating a transaction by its very nature is not a binding contract as Defendant contends. (Mem. L. at 9). The Hive-Down Plan, though signed by DBLA representatives, outlines forward-looking events that must occur for the Hive-Down to become effective. Further, Defendant has not supplied the Court with the date on which the transaction between DBLA and UBS Europe became effective. The Hive-Down Plan contemplates an effective date of October 1, 2004 or January 1, 2005 depending on when "the hive down is . . . entered in the commercial register of DBLA by [May 31,] 2005[.]" (Hive-Down Plan §§ 5.1, 5.3).

Though Defendant's papers indicate that the transaction occurred between October 1, 2004 and January 1, 2005, an email provided by the Trustee shows a DBLA-turned-UBS Europe employee explaining to FGG that the transaction occurred on May 2, 2005. (*Id.*; Hunt Decl. Ex. 1). Trustee's evidence shows that redemptions from Fairfield Sentry were sent to DBLA's New York bank account in April, May, and June of 2005. (Hunt Decl. Ex. 14). A question that begs to be answered: if DBLA and UBS Europe were two distinct entities with no continuity of ownership, what was DBLA doing redeeming shares in Fairfield Sentry that it had already sold to UBS Europe? (*Id.*) The relationship between DBLA and UBS Europe is not clear.

Resolving all ambiguities in the Plaintiff's favor, the Trustee has sufficiently pleaded that the transaction between DBLA and UBS Europe was a merger. Defendant is free to plead and prove that what occurred between DBLA and UBS Europe was an acquisition of assets, rather than a merger, at a later stage of litigation.

<u>Minimum Contacts</u>

Defendant argues that the Trustee has not alleged that UBS Europe, neither through its succession-in-interest to DBLA, or on its own accord, had sufficient contacts with New York. (Mem. L. ¶¶ 11–12).  The Complaint suggests otherwise.

i.    *DBLA's Contacts*

In the Complaint, the Trustee alleges that DBLA "knowingly directed funds to be invested with and then redeemed from New York-based BLMIS through Fairfield Sentry and Sigma." (Am. Compl. ¶ 16, ECF No. 1).  The Trustee has also alleged that Fairfield Sentry invested almost all of its assets in BLMIS.  *See* 09-01239 Compl. ¶ 228 ("Under Fairfield Sentry's offering memorandum, the fund's investment manager was required to invest no less than 95% of the fund's assets through BLMIS.") (adopted by reference, at paragraph 96, of this Complaint).  Additionally, the Trustee has alleged that DBLA's Miami office employees "met with FGG personnel and conducted due diligence on the [f]eeder [f]unds, Madoff, and BLMIS," "purposefully directed its investments to New York-based BLMIS," and "us[ed] bank accounts located in New York" and thus "derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein."  (Am. Compl. ¶¶ 17, 26).

The Trustee has also alleged that, through their communications, FGG personnel "provided DBLA with private placement memoranda . . . in order to solicit investment with Fairfield Sentry and Sigma" that explained how Madoff "served as the investment adviser, broker-dealer, and custodian" for those funds and that "control of Fairfield Sentry's and Sigma's investments rested entirely with BLMIS in New York."  (*Id.* ¶ 18).  The Trustee alleges that by executing the agreement, DBLA submitted to the jurisdiction of New York as the agreement specified that:

> [A]any suit, action, or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York. Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum.

*Id.* at ¶ 19.  The same agreement provided that DBLA consented to service of process out of any New York court and that such proceedings would be "governed and enforced in accordance with the laws of New York."  (*Id.*).

The Trustee has submitted additional evidence in response to the motion to dismiss showing extensive communications between DBLA employees and New York FGG employees to discuss investments with Fairfield.  (Hunt Decl. Exs. 15–16, 21–25, 28–31, ECF No. 122).  The Trustee alleges that, at all times, the DBLA employees knew the FGG employees were located in New York and intentionally directed their communications and investments to New York.  (Am. Compl. ¶ 21).  An email attests to a planned meeting between FGG New York employees at DBLA's Miami office in 2003 while another email memorializes FGG's visit to DBLA's office in Miami.  (Hunt Decl. Exs. 15, 29).

The Trustee has alleged that DBLA used New York bank accounts to transfer money to and from Fairfield Sentry and agreed that all subscription payments from DBLA would be directed to a New York HSBC Bank USA account and ultimately deposited in Fairfield Sentry's bank account.  (Am. Compl. ¶ 23).  A letter of understanding shows that DBLA was allowed to receive fees for promoting Fairfield funds and an email attests to DBLA using an account at Citibank New York to receive those fees.  (*Id.* Exs. 28, 31).  Another email shows correspondence between FGG and DBLA regarding rebates owed to DBLA being wired to DBLA's New York bank account.  (*Id.* Ex. 22).

Where a defendant chooses to use a United States bank account to receive funds, exercising personal jurisdiction over the defendant for causes of action relating to those transfers is constitutional. *Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56, 71 (S.D.N.Y. 2016); *Bahrain Islamic Bank v. Arcapita Bank (In re Arcapita Bank B.S.C.(C))*, 640 B.R. 604, 618 (S.D.N.Y. 2022) (stating that a bank submits to personal jurisdiction in the United States when it is "free to accept or reject the proposed terms" and still chooses to use a United States bank account); *see also Eldesouky v. Aziz*, No. 11–CV–6986 (JLC), 2014 WL 7271219, at *6–7 (S.D.N.Y. Dec. 19, 2014) (finding jurisdiction under New York long-arm statute based solely on defendant's use of New York account to receive payment at issue: "receiving Plaintiffs' money at a New York bank account suffices to establish personal jurisdiction over [Defendant]."); *HSH Nordbank AG N.Y. Branch v. Street*, No. 11 CIV. 9405 DLC, 2012 WL 2921875, at *4 (S.D.N.Y. July 18, 2012) ("District courts in this Circuit have upheld personal jurisdiction based upon a defendant's use of a correspondent bank account in New York where the use of that account was held to lay at the very root of the plaintiff's action.") (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 66 (2d Cir. 2012)); *Dandong v. Pinnacle Performance Ltd.*, 966 F. Supp.2d 374, 382–83 (S.D.N.Y. 2013) (same).

ii.     *UBS Europe's Contacts*

Regardless of whether this Court has jurisdiction over UBS Europe through its predecessor DBLA's contacts, the Trustee has also shown that UBS Europe made its own contacts with New York in connection with the Fairfield Funds. Attached as exhibits to the Hunt Declaration, the Trustee has shown that UBS Europe communicated regularly with FGG about UBS's shares in the Fairfield Funds and subscriptions being made by UBS. (Hunt Decl. Exs. 4–

8, ECF No. 122).  One email, in which a UBS Europe employee eagerly requests exposure to
Fairfield Sentry after missing a deadline, demonstrates the type of relationship UBS shared with
FGG: "PLEASE !!!! You upset because I didn't wrote [sic] for so long….[sic] are you ????
Hugs."  (*Id.* Ex. 6).  The emails show FGG and UBS employees referring to each other as "dear"
and a UBS Europe employee calling an FGG employee "my Hero" and saying "Love you !!!!!"
(*Id.* Ex. 7).  These emails not only suggest a close relationship between FGG New York and
UBS Europe employees, but also show that UBS Europe, not its predecessor DBLA, was
subscribing to and redeeming from the Fairfield Funds through FGG as early as November of
2005.  (*Id.* exs. 4–8).

The Complaint contains allegations that are legally sufficient to constitute a prima facie
showing of jurisdiction over UBS Europe, both as a successor-in-interest to DBLA and on its
own accord.  *Dorchester Fin. Sec. Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013).
"[A]lthough physical presence in the forum is not a prerequisite to jurisdiction, physical entry
into the State—either by the defendant in person or through an agent, goods, mail, or some other
means—is certainly a relevant contact."  *Walden v. Fiore*, 571 U.S. 277, 285 (2014).  Defendant
"intentionally tossed a seed from abroad to take root and grow as a new tree in the Madoff
money orchard in the United States and reap the benefits therefrom."  *Picard v. Bureau of Labor
Ins.* (*In re BLMIS*), 480 B.R. 501, 506 (Bankr. S.D.N.Y. 2012).  Defendant's alleged contacts
with New York are not random, isolated, or fortuitous.

**Arise out of or relate to the defendant's forum conduct**

As to the second prong, the suit must "arise out of *or relate to* the defendant's contacts
with the forum."  *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, __ U.S. __, 141 S. Ct. 1017,
1026, 209 L. Ed. 2d 225 (2021) (emphasis in original).  "[P]roof that a plaintiff's claim came

about because of the defendant's in-state conduct" is not required.  *Id.* at 1027.  Instead, the court

need only find "an affiliation between the forum and the underlying controversy."  *Goodyear*

*Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Picard v. BNP Paribas S.A.*

(*In re BLMIS*), 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Where the defendant's contacts with

the jurisdiction that relate to the cause of action are more substantial, however, it is not

unreasonable to say that the defendant is subject to personal jurisdiction even though the acts

within the state are not the proximate cause of the plaintiff's injury.") (internal quotations

omitted).

Here, the Trustee is asserting subsequent transfer claims against Defendant for monies it

received from the Fairfield Funds.  (Am. Compl. ¶¶ 99–106, ECF No. 1).  These allegations are

directly related to their investment activities with BLMIS via Fairfield Sentry.  *BNP Paribas*

*S.A.,* 594 B.R. at 191 (Bankr. S.D.N.Y. 2018) (finding that the redemption and other payments

the defendants received as direct investors in a BLMIS feeder fund arose from the New York

contacts such as sending subscription agreements to New York, wiring funds in U.S. dollars to

New York, sending redemption requests to New York, and receiving redemption payments from

a Bank of New York account in New York, and were the proximate cause of the injuries that the

Trustee sought to redress).

The suit is affiliated with the alleged in-state conduct.  *Goodyear Dunlop Tires*

*Operations, S. A. v. Brown*, 564 U.S. 915, 919 (2011).

**Reasonableness**

Having found sufficient minimum contacts, the Court must determine if exercising

personal jurisdiction over Defendant is reasonable and "comport[s] with fair play and substantial

justice."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (internal quotations

omitted).  Factors the Court may consider include the burden on the defendants, the forum

State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and

effective relief, the interstate judicial system's interest in obtaining the most efficient resolution

of controversies, and the shared interest of the several States in furthering fundamental

substantive social policies.  *Id.* at 477.

The exercise of jurisdiction is reasonable.  Defendant is not burdened by this litigation.

Defendant actively participated in this Court's litigation for over ten years.  It is represented by

U.S. counsel and intentionally invested in the Fairfield Funds.  Further, Defendant's predecessor

held bank accounts in New York and submitted to the jurisdiction of New York courts' when it

signed subscription agreements with the Fairfield Funds.[5]  (Am. Compl. ¶¶ 16, 19).  The forum

and the Trustee both have a strong interest in litigating BLMIS adversary proceedings in this

Court.  *Picard v. Maxam Absolute Return Fund, L.P. (In re BLMIS)*, 460 B.R. 106, 117 (Bankr.

S.D.N.Y. 2011), *aff'd*, 474 B.R. 76 (S.D.N.Y. 2012); *Picard v. Chais (In re BLMIS)*, 440 B.R.

274, 278 (Bankr. S.D.N.Y. 2010); *Picard v. Cohmad Sec. Corp. (In re BLMIS)*, 418 B.R. 75, 82

(Bankr. S.D.N.Y. 2009); *Picard v. Fairfield Greenwich Grp., (In re Fairfield Sentry Ltd.)*, 627

B.R. 546, 568 (Bankr. S.D.N.Y. 2021); *see also In re Picard*, 917 F.3d 85, 103 (2d Cir. 2019)

("The United States has a compelling interest in allowing domestic estates to recover

fraudulently transferred property.").

---

[5] Even though this Court held that the Defendant's consent to jurisdiction in New York courts contained in the subscription agreements it signed prior to investing with Fairfield Sentry could not be used as the sole basis for this Court's exercise of personal jurisdiction over an action by foreign liquidators to recover redemption payments under British Virgin Island law, the fact that Defendant agreed to submit to the jurisdiction of this Court is certainly a relevant factor in determining whether the exercise of jurisdiction over Defendant is reasonable.  *In Fairfield Sentry v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, Case No. 10-13164 (SMB), Adv. No. 10-03496 (SMB), 2018 WL 3756343, at *12 (Bankr. S.D.N.Y. Aug. 6, 2018) ("Defendants' consent to the Subscription Agreement does not constitute consent to personal jurisdiction in the U.S. Redeemer Actions."), *aff'd*, *Fairfield Sentry Ltd. v. Citibank, N.A. London*, No. 19-CV-3911 (VSB), 2022 WL 3644436, at *9 (S.D.N.Y. Aug. 24, 2022).

By alleging that Defendant intentionally invested in BLMIS, the Trustee has met his burden of alleging jurisdiction as to each subsequent transfer that originated with BLMIS. And by alleging that Defendant used a New York bank account, the Trustee has met his burden of alleging jurisdiction over each transfer that received through that New York bank account. As recognized by the Second Circuit, "[w]hen these [subsequent transfer] investors chose to buy into feeder funds that placed all or substantially all of their assets with Madoff Securities, they knew where their money was going." *In re Picard*, 917 F.3d 85, 105 (2d Cir. 2019). The Trustee has made a prima facie showing of personal jurisdiction with respect to all of the Fairfield Funds subsequent transfers at issue in this Complaint.

**12(b)(6) standard**

"To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The claim is facially plausible when a plaintiff pleads facts that allow the Court to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."). In deciding a motion to dismiss, the Court should assume the factual allegations are true and determine whether, when read together, they plausibly give rise to an entitlement of relief. *Iqbal*, 556 U.S. at 679. "And, of course, a well-pl[ed] complaint may proceed even if it

strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

In deciding the motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A complaint is "deemed to include any written instrument attached to it as an exhibit[,] . . . documents incorporated in it by reference[,]" and other documents "integral" to the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (citations omitted). A document is "integral" to a complaint when the plaintiff has "actual notice" of the extraneous information and relied on it in framing the complaint. *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (citing *Chambers*, 282 F.3d at 153).

The Trustee is seeking to recover approximately $9.3 million in subsequent transfers made to Defendant by Fairfield Sentry and Fairfield Sigma. (Am. Compl. ¶¶ 99–106, ECF No. 1).

**Recovery of Subsequent Transfers**

Pursuant to § 550(a) of the Bankruptcy Code, a trustee is entitled to recover avoided transfers of customer property from initial transferees as well as from "any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a). "To plead a subsequent transfer claim, the Trustee must plead that the initial transfer is avoidable, and the defendant is a subsequent transferee of that initial transferee, that is, that the funds at issue originated with the debtor." *Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 195 (Bankr. S.D.N.Y. 2018); *see also SIPC v. BLMIS (In re Consol. Proc. On 11 U.S.C. § 546(e))*, No. 12 MC 115, 2013 WL

1609154, at *7 (S.D.N.Y. Apr. 15, 2013). "Federal Civil Rule 9(b) governs the portion of a claim to avoid an initial intentional fraudulent transfer and Rule 8(a) governs the portion of a claim to recover the subsequent transfer." *BNP Paribas*, 594 B.R. at 195 (*citing Sharp Int'l Corp. v. State St. Bank & Trust Co., (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005).

The Trustee only needs to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The plaintiff's burden at the pleading stage does not require exact accounting of the funds at issue. *BNP Paribas*, 594 B.R. at 195. Rather "[t]he plaintiff must allege the necessary vital statistics – the who, when, and how much – of the purported transfers to establish an entity as a subsequent transferee of the funds." *Id.* However, the plaintiff's burden at the pleading stage does not require dollar-for-dollar accounting of the exact funds at issue." *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 195 (Bankr. S.D.N.Y. 2018).

While the Trustee must allege that the initial transfer from BLMIS to Fairfield Sentry is avoidable, he is not required to avoid the transfer received by the initial transferee before asserting an action against subsequent transferees. *IBT Int'l Inc. v. Northern (In re Int'l Admin Servs., Inc.)*, 408 F.3d 689, 706-07 (11th Cir. 2005). The Trustee is free to pursue any of the immediate or mediate transferees, and nothing in the statute requires a different result. *Id.*

The Trustee pleaded the avoidability of the initial transfer (from BLMIS to Fairfield Sentry) by adopting by reference the entirety of the complaint filed against Fairfield Sentry in adversary proceeding 09-1239 ("Fairfield Complaint"). (Am. Compl. ¶ 35). Whether the Fairfield Complaint properly pleads the avoidability of the initial transfer, is governed by Rule 9(b). Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a

person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

> Where the actual fraudulent transfer claim is asserted by a bankruptcy trustee, applicable Second Circuit precedent instructs courts to adopt a more liberal view since a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge. Moreover, in a case such as this one, where the Trustee's lack of personal knowledge is compounded with complicated issues and transactions that extend over lengthy periods of time, the trustee's handicap increases, and even greater latitude should be afforded.

*Picard v. Cohmad Secs. Corp.,* (*In re BLMIS*), 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011) (cleaned

up).

**The Safe Harbor**

Defendant has raised the "safe harbor" defense, found in § 546(e), to the Trustee's

allegations. (Mem. L. 22–30, ECF No. 100). Section 546(e) is referred to as the safe harbor

because it protects a transfer that is a "settlement payment ... made by or to (or for the benefit of)

a ... financial institution [or] financial participant," or that is "made by or to (or for the benefit of)

a ... financial institution [or] financial participant ... in connection with a securities contract." 11

U.S.C. § 546(e). "By its terms, the safe harbor is a defense to the avoidance of the *initial*

transfer." *BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. at 197 (emphasis in original). Where the

initial transferee fails to raise a § 546(e) defense against the Trustee's avoidance of certain

transfers, as is the case here, the subsequent transferee is entitled to raise a § 546(e) defense

against recovery of those funds. *Picard v. Fairfield Inv. Fund (In re BLMIS)*, No. 08-01789

(CGM), Adv. No. 09-01239 (CGM), 2021 WL 3477479, at *3 (Bankr. S.D.N.Y. Aug. 6, 2021).

In *Fishman*, the Court of Appeals for the Second Circuit determined that, in many of the

Trustee's avoidance actions, § 546(e) applied because BLMIS' transfers to its customers

qualified as payments made "in connection with" securities contracts between BLMIS and its

customers. *See Picard v. Ida Fishman Recoverable Trust (In re BLMIS)*, 773 F.3d 411, 422 (2d

Cir. 2014). However, the safe harbor does not apply, by its plain terms, to transfers where the transferee is complicit in BLMIS' fraud. *Picard v. Multi-Strategy Fund Ltd. (In re BLMIS)*, No. 22-CV-06502 (JSR), 2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022). This is because "any transferee who knew the transfers it received from Madoff Securities contained only stolen proceeds also knew those transfers were neither settlement payments [n]or transfers in connection with a security agreement" and therefore, § 546(e) cannot apply.[6]  *Id.*

> The safe harbor was intended, among other things, to promote the reasonable expectations of legitimate investors. If an investor knew that BLMIS was not actually trading securities, he had no reasonable expectation that he was signing a contract with BLMIS for the purpose of trading securities for his account. In that event, the Trustee can avoid and recover preferences and actual and constructive fraudulent transfers to the full extent permitted under state and federal law.
>  *Picard v. Legacy Capital Ltd. (In re BLMIS)*, 548 B.R. 13, 28 (Bankr. S.D.N.Y. 2016)

(internal citations omitted), *vacated and remanded on other grounds, Picard v. Citibank, N.A. (In re BLMIS)*, 12 F.4th 171 (2d Cir. 2021)). By holding that the affirmative defense provided by § 546(e) is not applicable in situations such as the one alleged here, "sham" securities contracts do not prevent the Trustee from clawing back complicit parties' ill-gotten gains. The district court has already determined that "those defendants who claim the protections of Section 546(e) through a Madoff Securities account agreement but who actually knew that Madoff Securities was a Ponzi scheme are not entitled to the protections of the Section 546(e) safe harbor, and their motions to dismiss the Trustee's claims on this ground must be denied." *SIPC v. BLMIS* (*In re Consolidated Proceedings on 11 U.S.C. §546(e)*), No. 12 MC 115(JSR), 2013 WL 1609154, at *10 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*"); *see also Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR), 2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022) ("[I]n

---

[6] While this is sometimes referred to as the "knowledge exception" to the safe harbor, "*Cohmad* did not carve out a textual but equitable exception to an otherwise applicable Section 546(e) defense; rather, it simply concluded that, in circumstances in which a transferee was complicit in Madoff Securities' fraud, Section 546(e) did not apply as a matter of its express terms." *Picard v. Multi-Strategy Fund Ltd. (In re BLMIS)*, No. 22-CV-06502 (JSR), 2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022).

circumstances in which a transferee was complicit in Madoff Securities' fraud, Section 546(e) d[oes] not apply as a matter of its express terms.").

On the issue of the safe harbor, the Court adopts the district court's reasoning in *Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR), 2022 WL 16647767 (S.D.N.Y. Nov. 3, 2022). The Trustee has alleged that Fairfield Sentry knew the payments it received from BLMIS were neither settlement payments nor payments in connection with a securities contract. "The safe harbor was intended, among other things, to promote the reasonable expectations of legitimate investors. If an investor knew that BLMIS was not actually trading securities, he had no reasonable expectation that he was signing a contract with BLMIS for the purpose of trading securities for his account. In that event, the Trustee can avoid and recover preferences and actual and constructive fraudulent transfers to the full extent permitted under state and federal law." *Picard v. Legacy Capital Ltd. (In re BLMIS)*, 548 B.R. 13, 28 (Bankr. S.D.N.Y. 2016) (internal citations omitted), *vacated and remanded on other grounds, Picard v. Citibank, N.A. (In re BLMIS)*, 12 F.4th 171 (2d Cir. 2021).

This Court is powerless to reconsider this issue, agrees with the district court's reasoning, and finds its holding consistent with dicta set forth by the Court of Appeals for the Second Circuit. *See Picard v. Ida Fishman Revocable Trust* (*In re BLMIS*), 773 F.3d 411, 420 (2d Cir. 2014) ("The clawback defendants, having every reason to believe that BLMIS was actually engaged in the business of effecting securities transactions, have every right to avail themselves of all the protections afforded to the clients of stockbrokers, including the protection offered by § 546(e).").

This Court has already determined that the Fairfield Complaint contains sufficient allegations of Fairfield Sentry's actual knowledge to defeat the safe harbor defense on a Rule

12(b)(6) motion.  *See Picard v. Fairfield Inv. Fund (In re BLMIS)*, No. 08-01789 (CGM), Adv.

No. 09-01239 (CGM), 2021 WL 3477479, at *4 (Bankr. S.D.N.Y. Aug. 6, 2021) ("[T]he Trustee

has alleged that the agents and principals of the Fairfield Funds had actual knowledge of

Madoff's fraud").  In that adversary proceeding, the Court held that "[t]he Trustee has pled

[actual] knowledge in two ways: 1) that certain individuals had actual knowledge of Madoff's

fraud, which is imputed to the Fairfield Funds; and 2) that actual knowledge is imputed to the

Fairfield Funds through 'FGG,' an alleged 'de facto' partnership."  *Id.* at *4; (*see also* Fairfield

Compl. ¶ 320) ("Fairfield Sentry had actual knowledge of the fraud at BLMIS"); (Fairfield

Compl. ¶ 321) ("Greenwich Sentry and Greenwich Sentry Partners had actual knowledge of the

fraud at BLMIS"); (Fairfield Compl. ¶ 322) ("FIFL had actual knowledge of the fraud at

BLMIS"); (Fairfield Compl. ¶ 323) ("Stable Fund had actual knowledge of the fraud at

BLMIS"); (Fairfield Compl. ¶ 324) ("FG Limited had actual knowledge of the fraud at

BLMIS"); (Fairfield Compl. ¶ 325) ("FG Bermuda had actual knowledge of the fraud at

BLMIS"); (Fairfield Compl. ¶ 326) ("FG Advisors had actual knowledge of the fraud at

BLMIS"); (Fairfield Compl. ¶ 327) ("Fairfield International Managers had actual knowledge of

the fraud at BLMIS"); (Fairfield Compl. ¶ 328) ("FG Capital had actual knowledge of the fraud

at BLMIS"); (Fairfield Compl. ¶ 329) ("Share Management had actual knowledge of the fraud at

BLMIS"); (Fairfield Compl. ¶ 9) ("It is inescapable that FGG partners knew BLMIS was not

trading securities. They knew BLMIS's returns could not be the result of the split strike

conversion strategy (the 'SSC Strategy'). They knew BLMIS's equities and options trading

volumes were impossible. They knew that BLMIS reported impossible, out-of-range trades,

which almost always were in Madoff's favor. They knew Madoff's auditor was not certified and

lacked the ability to audit BLMIS. They knew BLMIS did not use an independent broker or

custodian. They knew Madoff refused to identify any of BLMIS's options counterparties. They knew their clients and potential clients raised numerous due diligence questions they would not and could not satisfactorily answer. They knew Madoff would refuse to provide them with honest answers to due diligence questions because it would confirm the details of his fraud. They knew Madoff lied about whether he traded options over the counter or through the exchange. They knew they lied to clients about BLMIS's practices in order to keep the money flowing and their fees growing. And they knowingly misled the SEC at Madoff's direction.").

"In sum, if the Trustee sufficiently alleges that the [initial] transferee from whom he seeks to recover a fraudulent transfer knew of [BLMIS ]'[s] fraud, that transferee cannot claim the protections of Section 546(e)'s safe harbor." *Picard v. Fairfield Inv. Fund* (*In re BLMIS*), No. 08-01789 (CGM), 2021 WL 3477479, at *4 (Bankr. S.D.N.Y. Aug. 6, 2021). This Court determined that the Fairfield Complaint is replete with allegations demonstrating that Fairfield Sentry had actual knowledge that BLMIS was not trading securities. *Id.* at *3–7. Where § 546(e) does not "embrace the initial transfer, the subjective knowledge of a subsequent transferee cannot retroactively render it applicable." The Trustee's allegations in the Fairfield Complaint are sufficient to survive a Rule 12(b)(6) motion on this issue.

**Good Faith Defense**

Defendant argues that it took subsequent transfers "for value, in good faith, and without knowledge of the voidability of the transfer avoided." (Mem. L. 23–27, ECF No. 115).

i.    *For Value*

The "value" that a subsequent transferee must provide is "merely consideration sufficient to support a simple contract, analogous to the 'value' required under state law to achieve the status of a bona fide purchaser for value." *Picard v. Legacy Capital Ltd.* (*In re BLMIS*), 548

B.R. 13, 37 (Bankr. S.D.N.Y. 2016) (citation omitted); *accord Enron Corp. v. Ave. Special Situations Fund II, L.P.* (*In re Enron Corp.*), 333 B.R. 205, 236 (Bankr. S.D.N.Y. 2005).  In addition, the "value" element under § 550(b)(1) looks to what the transferee gave up rather than what the transferor received.  The Complaint contains no mention of UBS Europe exchanging shares for consideration.  (*See* Am. Compl., ECF No. 1).  Therefore, the "value" defense is not asserted on the face of the Complaint.

Defendant argues that the payments it received were given in exchange for the redemption of shares in the Fairfield Funds.  (Mem. L. 24).  If Defendant knew at the time it redeemed its shares that the shares were worthless, then it did not receive the subsequent transfer funds "for value" as is required under § 550.  *See Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 301 (Bankr. S.D.N.Y. 2018), *aff'd sub nom. Fairfield Sentry Lt*d. v. Citibank, N.A. London, No. 19-CV-3911 (VSB), 2022 WL 4391023 (S.D.N.Y. Sept. 22, 2022) ("The only exception concerns the Knowledge Defendants that received redemption payments with the knowledge that the NAV was wrong. In those circumstances, the Liquidators may seek to impose a constructive trust.").  It has not yet been determined whether Defendant knew if the shares it redeemed from the Fairfield Funds had value.

"Value" is Defendant's burden to plead and prove.  *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 198 (Bankr. S.D.N.Y. 2018).  Whether the Defendant gave value is a question of fact to be resolved either at the summary judgment stage or at trial.  *Picard*, 2021 WL 3477479, at *9.

    *ii.*    *Good Faith*

Where, in light of surrounding circumstances, a transferee should have known of the debtor's precarious financial condition, the transferee will be deemed to have taken in bad faith, unless an investigation into the debtor's financial condition actually discloses no reason to suspect financial trouble.  2 Bankruptcy Desk Guide § 19:105.  The District Court recently explained that good faith is a fact-intensive inquiry that almost always requires a trial: "[t]he Second Circuit made clear . . . that the inquiry notice standard requires a 'fact-intensive inquiry to be determined on a case-by-case basis, which naturally takes into account the disparate circumstances of differently-situated transferees.'"  *In re BLMIS*, No 20-cv-02586(CM), 2022 WL 1304589, at *3 (S.D.N.Y. May 2, 2022) (citing *Picard v. Citibank, N.A.* (*In re BLMIS*), 12 F.4th 171 (2d Cir. 2021), cert. denied No. 21-1059 (Feb. 28, 2022).  And that "such a fact-based determination can only be made based on the entirety of the factual record after discovery . . . ." *Id.* (internal quotation omitted).

The burden of proving good faith falls squarely on Defendant, and this Court cannot make a determination on Defendant's affirmative defense until after a fact-intensive inquiry. Discovery is required on this issue.

### iii.    *Knowledge of Avoidability*

Good faith is linked with whether one had knowledge of the voidability of the transfer. *Picard v. Citibank, N.A.* (*In re BLMIS*), 12 F.4th 171, 189 (2d Cir. 2021) ("[A] transferee does not act in good faith when he has sufficient actual knowledge to place him on inquiry notice of the debtor's possible insolvency."), *cert. denied sub nom. Citibank, N.A. v. Picard*, 212 L. Ed. 2d 217, 142 S. Ct. 1209 (2022).  Having determined that "good faith" cannot be found on the face of a complaint, the Court must deny the Defendant's motion on this element.  Additionally, § 550(b)(1) provides a defense to recovery making lack of knowledge Defendant's burden to plead

and prove.  It is a fact-intensive inquiry that requires a three-step inquiry into 1) what UBS Europe subjectively knew; 2) "whether these facts put [them] on inquiry notice of the fraudulent purpose behind a transaction—that is, whether the facts the transferee[s] knew would have led a reasonable person in the[ir] position to conduct further inquiry into a debtor-transferor's possible fraud; and 3) whether "diligent inquiry by [UBS Europe] would have discovered the fraudulent purpose of the transfer." *Id.* at 192.

It is not appropriate for the Court to resolve these factual issues at this stage of the litigation.

**Mere Conduit**

UBS Europe argues that it was a "mere conduit" and not a subsequent transferee because the Trustee did not allege facts suggesting that DBLA exercised dominion and control over, or held legal title to, the money it received from Fairfield Sentry or acted with discretion for using transfers it received.  (Mem. L.  23, ECF No. 115).  The Court of Appeals for the Second Circuit held in *In re Finley* that a financial intermediary is not an "initial transferee" for purposes of § 550.  *Finley v. Alexander (In re Finley)*, 130 F.3d 52, 57 (2d Cir. 1997).  Some courts have applied the "dominion or control" test to subsequent transferees.  *See Miller v. Porush (In re Stratton Oakmont, Inc.)*, 234 B.R. 293, 313 n.9 (Bankr. S.D.N.Y. 1999) (applying the dominion and control test to subsequent transferees) (citing *Bonded Fin. Servs., Inc. v. Eur. Am. Bank*, 838 F.2d 890, 894 (7th Cir. 1988)).

UBS Europe has failed to even identify for whom they or DBLA was allegedly acting as a conduit.  The Trustee has alleged that UBS Europe is the successor-in-interest to DBLA and that DBLA was a customer of Fairfield Sentry and Fairfield Sigma.  (Am. Compl. ¶ 99, 103). DBLA signed subscription agreements with Fairfield Sentry and Fairfield Sigma.  (*Id.* ¶ 16).

The accounts at Fairfield Sentry and Fairfield Sigma were held in the name of DBLA.  (Hunt Decl. Exs. 10–11, ECF No. 122).  The Trustee has plausibly alleged that DBLA exercised dominion and control over the investments and redemption of BLMIS customer property. Defendant is free plead and prove otherwise at a later stage of litigation. *See Enron Corp. v. J.P. Morgan Sec. Inc*. (*In re Enron Corp*.), 361 B.R. 36, 49 (Bankr. S.D.N.Y. 2006) (stating that the burden of proof is on the defendant asserting a mere conduit defense); *Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296, 1304 (11th Cir. 2020) ("[T]he mere conduit defense is an affirmative defense that must be proved by the defendant seeking its protection.").

<u>Conclusion</u>

For the foregoing reasons, Defendant's motion to dismiss is denied.  The Trustee shall submit a proposed order within fourteen days of the issuance of this decision, directly to chambers (via E-Orders), upon not less than two days' notice to all parties, as required by Local Bankruptcy Rule 9074-1(a).

/s/ Cecelia G. Morris



**Dated: March 29, 2023**
**Poughkeepsie, New York**

_____
**Hon. Cecelia G. Morris**
**U.S. Bankruptcy Judge**